OPINION OF THE COURT
Thomas P. Phelan, J.
In this special proceeding challenging the condemnation of certain property, petitioners seek judgment declaring that (i) the condemnation was unauthorized or excessive or both; (ii) the condemnation is null and void; and (iii) the condemnation is invalid because the Eminent Domain Procedure Law is unconstitutional on its face and, alternatively, because respondent’s application of EDPL 206 to petitioners unconstitutionally deprived petitioners of their property. Lastly, petitioners seek restoration of all right, title and interest in their property as of the date of the wrongful condemnation and an award of all costs, including attorneys’ fees.
In answer to the amended petition, respondents raised three objections: (1) improper procedure pursuant to CPLR article 78; (2) improper amendment of the petition; and (3) failure to serve the New York Attorney General in violation of CPLR 1012 (b).
Petitioners are the owners of approximately one million square feet of property in Bethpage, New York. That property formerly belonged to Northrup Grumman, and today much of it is leased to others. This proceeding concerns .544 acres of petitioners’ property acquired in 2005 for the development of a fast-track power plant known as Bethpage 3. The sole general partner of petitioner Steel Los III, LP and the president of copetitioner Associated Brook Corp. is Joseph Lostritto.
Petitioners’ property is adjacent to property owned by Calpine Corporation and its affiliates. Calpine is a developer of power plants and a power producer, operating dozens of power plants in North America. Calpine constructed a power plant on its property in 2001 and had been approached by the Long Island Power Authority (LIPA) in 2003 to construct Bethpage 3.
LIPA is the electric utility that provides service to the ratepayers in Nassau and Suffolk Counties and parts of Queens County. It acts as a conduit for the transmission of energy.
Respondent, Power Authority of the State of New York (NYPA), is the state agency responsible for providing wholesale power throughout the State of New York. NYPA owns and operates 16 major electric generating projects and employs a large *709 staff with expertise in various areas including permitting, code compliance and property acquisition.
Petitioners commenced an action in April 2005 seeking to enjoin NYPA from condemning its property. This court denied preliminary injunctive relief on the grounds that the court lacked jurisdiction.
By decision dated October 31, 2006, this court’s order was reversed (Steel Los III, LP v Power Auth. of State of N.Y., 33 AD3d 990 [2d Dept 2006]). The Appellate Division, Second Department, determined that this court did have jurisdiction to determine petitioners’ challenge to NYPA’s condemnation of its property, because NYPA had proceeded under one of the exemptions provided in section 206 of the EDPL, enabling NYPA to proceed without compliance with the notice, hearing and determination provisions otherwise required by statute. The appellate court remanded the matter for further proceedings, including conversion of the action into a special proceeding. By order dated February 15, 2007, the action was deemed a special proceeding pursuant to CPLR article 78.
The motion for leave to appeal to the Court of Appeals was dismissed by order dated June 5, 2007 (8 NY3d 998 [2007]).
On June 28, 2007, the notice of petition and petition were served. A verified answer and objection in point of law is dated July 5, 2007, and according to respondent was served by mail on that date. Petitioners served an amended petition on respondent on August 1, 2007, and on the Attorney General on August 2, 2007. The verified answer to the amended petition, containing three objections in point of law, is dated September 4, 2007. By letter dated September 18, 2007, respondent withdrew its third objection in point of law and part of the first objection in point of law.
Respondent’s first objection in point of law is that petitioners have failed to comply with article 78 in that “[t]he amended petition is not supported by any sworn affidavits” and therefore petitioners must be “barred from submitting affidavits, evidence, or argument in reply to respondent’s papers.” A verified pleading may be utilized as an affidavit (CPLR 105 [u]), and, here, the amended petition is verified by Joseph Lostritto. Furthermore, the court notes that CPLR 7804 (d) does not require that affidavits accompany a petition. Based on the foregoing, the first objection in point of law is dismissed.
Respondent’s second objection in point of law is that the amended petition was untimely and therefore a nullity. Here, *710 the original answer was mailed on July 5, 2007, and accordingly petitioners’ time to amend as of right extended to July 30, 2007 (CPLR 3025 [a], CPLR 2103 [b] [2]). Under these circumstances service of the amended petition on August 1, 2007 was late. Nevertheless, leave to amend may be granted at any time (CPLR 3025 [b]), and, in the absence of any demonstrated prejudice to respondent from the de minimis delay, the court sua sponte grants petitioners leave to serve the amended petition (Leitner v Jasa Hous. Mgt. Servs. for Aged, 6 AD3d 667 [2d Dept 2004]; see Weck v Brett, 288 AD2d 466 [2d Dept 2001]). Accordingly, the second objection in point of law is dismissed.
In the period 2003 through 2004, LIPA determined that, due to the “drastic energy needs” anticipated for the summer of 2005, a fast-track project involving construction of additional power plants was necessary. In the absence of such a project, the potential shortfall of power endangered not only LIPA customers but the entire northeast power grid, including the City of New York.
In the fall of 2003, LIPA negotiated exclusively with Calpine for construction of an additional power plant. According to the amended petition, in September 2003, in connection with its negotiations with LIPA, Calpine sought to purchase the subject property from petitioners for $1,600,000 (see Calpine letter to Lostritto dated Oct. 23, 2003, annexed as exhibit L in vol IV). Petitioners were not interested in selling the property (petitioners’ supplemental exhibits, exhibit E), noting their critical need for the front parking lot for petitioners’ office tenants.
At some point LIPA ceased exclusive negotiations with Calpine. LIPA issued a public request for proposal (RFP) on February 23, 2004. In the RFP (respondent’s supplemental administrative record, vol III, exhibit 2) LIPA sought an agreement to purchase electricity for 20 years from a power plant not to exceed 79.9 megawatts in generating capacity. The RFP also required a commercial operation date of no later than early summer 2005.
The RFP provided the following regarding the proposed site of the power plant:
“II. a. Site: The generation facility shall be located on a site in Nassau County, Suffolk County or the portion of Queens County known as the Rockaways controlled by [the bidder] through either fee ownership, a land lease, option to lease or purchase, or equivalent demonstration of site control. [The bid *711 der] shall provide evidence of such site control in its proposal.” (RFP at 2 [emphasis added].)
The RFP did not require that bidders own the proposed site nor did it require acquisition by LIPA of the proposed site as a prerequisite for a bid.
Shortly thereafter, in March 2004, petitioners and an affiliate of Calpine entered into a lease (Bethpage lease) of petitioners’ property. The Bethpage lease (petitioners’ supplemental exhibits, exhibit F), dated March 1, 2004, provided for a 35-year term with a 10-year extension option. The property was to be used for the construction and operation of a 79.9 megawatt (plus or minus 5%) natural gas-fired combined cycle electric generating facility. The Bethpage lease required annual rent payments starting at $430,000 in 2004 and reaching $530,000 by 2008, with an annual 2% increase thereafter. Based upon the Bethpage lease, Calpine submitted its proposal in response to the RFP to LIPA on March 22, 2004.
On June 21, 2004, following a hearing that took place on June 18, 2004, the Public Service Commission issued a certificate of public convenience and necessity to Calpine for the construction and operation of a 79.9 megawatt power plant.
On July 8, 2004, LIPA awarded Calpine the power purchase agreement (PPA) to construct Bethpage 3 on petitioners’ property and sell the electric generating capacity to LIPA. The PPA provided for a period of only 20 years, well within the 35-year term of the Bethpage lease. The amount awarded to Calpine under its proposal submitted pursuant to the RFP equaled approximately 20% less than the amount proposed during the negotiations between Calpine and LIPA which took place before the RFP was issued (Peterson transcript at 74).
In order to provide LIPA with assistance in carrying out the fast-track projects necessary for power production in the summer of 2005, NYPA entered into a memorandum of understanding (petitioners’ supplemental exhibits, exhibit B) with LIPA on July 6, 2004. According to LIPA, NYPA’s assistance was sought because NYPA has the ability to supercede all local authority and issue building permits, approve code compliance and issue a certificate of occupancy (Peterson transcript at 23).
On August 4, 2004, NYPA and Calpine executed an access and custody agreement (petitioners’ supplemental exhibits, exhibit H), whereby Calpine delivered to NYPA custody and control of the entire project site, including the property, to the extent of Calpine’s rights therein. This custody and control of *712 the site enabled NYPA to perform its task of permitting, and immediately thereafter NYPA issued the first construction permit for the project.
NYPA argues that the access and control agreement was a temporary measure that gave it “sufficient ‘effective control’ to temporarily exercise its statutory authority to issue building permits and perform code compliance inspections” (supplemental mem of law in opposition at 13). According to NYPA, before a certificate of occupancy could issue, it needed fee ownership (Clemente transcript at 69, 152).
Calpine’s former project development director for Bethpage 3, John Niland, testified that, from Calpine’s perspective, the Bethpage lease was “fine” and he thought Calpine would simply assign the Bethpage lease to LIPA and NYPA (Niland transcript at 34, 38). Mr. Niland also testified that in late 2004 Calpine offered to purchase the property for approximately $6,000,000. Calpine further offered an installment payment agreement that was the subject of a power point presentation. In both cases petitioners declined (Niland transcript at 150-157).
From the outset, NYPA planned to acquire the entire project site for the Bethpage 3 power plant. In e-mails dated as early as July 26, 2004 (Clemente transcript, exhibit 2), there is discussion about acquisition, and a “Confidential” condemnation plan (Clemente transcript, exhibit 4) was discussed by NYPA, LIPA and Calpine on October 7, 2004 (id.). NYPA’s former counsel, John Clemente, wrote a memo wherein he stated that “[o]wnership of the land was the key to unfettered control” and “landlord/tenant relationships for 30% of the power plant site would not work” (Clemente transcript, exhibit 9). Counsel Clemente’s memo ultimately triggered approval of the acquisition plan by the head of NYPA (Clemente transcript at 142).
While the plan for acquisition is clear, the need for it is not. Answers to deposition questions concerning the alleged need for ownership of the plant site were vague and speculative.
The following are examples:
“You can’t have an intervenor who is not involved in the power industry own the property the power plant is on. It’s an untenable situation in my perspective . . . Because their needs aren’t related to power and so — I mean, they could somehow potentially impact the safe reliable flow of electricity and that’s way too risky ... As I said, it’s too risky because if there’s a problem, it’s too late.” *713 (Potak transcript at 60-61.)
“In my view, the issue that you raised, having this third party who’s not involved in the generation business being indirectly involved, could in some fashion jeopardize the ongoing operation of the generator.” (Peterson transcript at 160.)
Nor was the need for acquisition clear to Calpine, who alleges that it first learned of the plan to acquire petitioners’ property in September or October 2004 (Niland transcript at 36).
Only John Clemente offered some explanation. He testified:
“The state has to control the property in situations like this if it’s to assure that the energy is going to be in the grid when everybody plans for it to be there. There are too many unknowns if you have to deal with other parties in connection with the property and they run the gamut . . . You can’t have anyone else with the controlling for any kind of property because you then have someone else you have to deal with. And you can’t have a private party because that would bring in the locals . . . The property would be subject to local taxation and local interests . . . local zoning, local codes, and any other requirement the local government would choose to impose on the owner.” (Clemente transcript at 52-54.)
Nowhere has NYPA or LIPA cited any authority for this testimony. Nor has NYPA explained why the need to own the property was not anticipated in the RFP for the project, which specifically allowed the project developers to exercise site control through a land lease.
By letter dated February 18, 2005 (petitioners’ supplemental exhibits, exhibit L), NYPA first informed petitioners that it was taking “steps” to acquire the property in accordance with the EDPL.
By letter dated March 11, 2005, NYPA offered petitioners $357,600 for the property. That is $5,642,400 less than Calpine offered in late 2004.
On March 18, 2005, Calpine entered into a 20-year lease with LIPA (Peterson transcript, vol III, exhibit 11) for the entire property upon which Bethpage 3 was built, including petitioners’ property.
The rental charge was to be an amount that amortized the yet-to-be-determined acquisition price over the life of the lease (Niland transcript at 57; Potak transcript at 121; “Confidential” condemnation plan, step four).
*714 A purchase price is set forth in Schedule B to the Calpine/ LIPA lease. Before the commercial operation date the purchase price was $1,215,227, and the price steadily decreased with each passing month. After 20 years, the purchase price of the entire site, both Calpine’s former two thirds of the property and petitioners’ one third of the property, cost exactly $1.
On April 11, 2005, NYPA and LIPA met with petitioners who wanted to discuss any possible alternatives to acquisition. Joseph Lostritto states that he offered NYPA a number of options including various revisions to the Bethpage lease. One such option was an agreement to limit petitioners’ remedies in the event of an uncured default so that any such remedies would not interfere with the operation of the power plant. NYPA and LIPA declined all alternatives.
On April 13, 2005, NYPA filed the acquisition map for the property with the Nassau County Clerk and thereby acquired all of the property upon which Bethpage 3 was built, including petitioners’ property.
It is unclear how the entire site was transferred from NYPA to LIPA. Bethpage 3 began commercial operations on July 1, 2005. In January 2007, petitioners filed a verified claim in the Court of Claims.
The power of eminent domain is the right of the State, as sovereign, to take private property for “public use,” upon making just compensation (People v Adirondack Ry. Co., 160 NY 225, 237 [1899], affd 176 US 335 [1900]). Eminent domain predates the State and Federal Constitutions and survived their adoption, subject only to the restrictions that the taking shall be for an authorized “public use” and that just compensation shall be paid to the owner (US Const 5th, 14th Amends; NY Const, art I, § 7; Fifth Ave. Coach Lines v City of New York, 11 NY2d 342, 347 [1962]).
The question of whether a taking is for a “public use” is one for the court (see Yonkers Community Dev. Agency v Morris, 37 NY2d 478, 485 [1975]; Fifth Ave. Coach Lines, 11 NY2d at 349; Matter of 49 WB, LLC v Village of Haverstraw, 44 AD3d 226, 235 [2d Dept 2007]). Although the scope of review is narrow since the exercise of eminent domain is a legislative function (Matter of West 41st St. Realty v New York State Urban Dev. Corp., 298 AD2d 1 [1st Dept 2002], appeal dismissed 98 NY2d 727 [2002], cert denied 537 US 1191 [2003]), courts are required to be more than rubber stamps (Yonkers Community Dev. Agency v Morris, 37 NY2d at 485; Matter of 49 WB, LLC v Village of Haverstraw, 44 AD3d at 235).
*715 A governmental body may not take property by eminent domain for the purpose of conferring a private benefit on a particular private party, nor may the government take property under the pretext of a public purpose, when the actual purpose is to bestow a private benefit (Kelo v New London, 545 US 469, 477-478 [2005]; Matter of 49 WB, LLC, 44 AD3d at 238). An incidental private benefit will not invalidate a condemnation of property so long as the public purpose is dominant (see Matter of Waldo’s, Inc. v Village of Johnson City, 74 NY2d 718, 721 [1989]; Matter of Aspen Cr. Estates, Ltd. v Town of Brookhaven, 47 AD3d 267, 275 [2d Dept 2007]). The principle that no more may be taken than is required for a particular public purpose applies not only as to the volume of the land to be taken but as well to the nature or extent of the estate in the property to be taken; there may not be acquisition of a fee when only an easement is required (Hallock v State of New York, 32 NY2d 599, 605 [1973]).
Ordinarily the exercise of eminent domain is preceded by notice, a hearing and published findings (see EDPL 202-204, Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 417-418 [1986]). In this case, NYPA proceeded pursuant to EDPL 206 (D), which provides an exemption from the aforementioned statutory requirements due to an “emergency situation” wherein “the public interest will be endangered by any delay.” The emergency situation alleged here was the need for construction of a fast-track power plant to be operational by July 1, 2005. The public interest or public use was the need to meet the energy demand on Long Island (Potak transcript at 48). Petitioners dispute the validity of both.
The evidence shows that from the time NYPA came on board, acquisition of the entire property needed for the project was planned. Petitioners have shown that it was NYPA’s policy to acquire the property underlying power plant construction sites, because the issue for NYPA was always one of control, and to NYPA, control meant ownership (Potak transcript at 60, 88). As far as NYPA was concerned, acquiring property was the only way to get the effective custody that NYPA was “comfortable with” (Potak transcript at 61). NYPA routinely attempted to convince property owners to relinquish ownership through a “friendly taking” (Potak transcript at 112-114). In this case, when petitioners declined a “friendly taking,” NYPA invoked the “emergency” exemption of the EDPL and proceeded to acquire petitioners’ property.
*716 The court notes that collectively four witnesses with many years of service in the power industry in New York could recall only one occasion in which NYPA had acquired property for a power plant through hearings and a written determination as prescribed by the EDPL (Clemente transcript at 133-134). On this record, at the very least, NYPA was unaccustomed to utilizing the procedures the legislature provided in the EDPL.
NYPA claims that its staff worked diligently from the fall of 2004 to research and analyze the various title, survey and mapping issues and produced a final acquisition map in January 2005. NYPA further claims that lease negotiations between LIPA and Calpine delayed the acquisition of the site. At the very least these claims are conclusory and self-serving. Calpine had every reason to move quickly, as it would be subject to penalties if the power plant did not commence commercial operations on July 1, 2005. LIPA and NYPA were equally anxious to avoid an energy crisis in the summer of 2005.
NYPA’s counsel testified that the hearings required for ordinary acquisition take approximately six to seven months (Clemente transcript at 136). Consequently, it appears that NYPA had time to engage in the ordinary acquisition procedures without utilization of the “emergency” exemption in EDPL 206 (D). However, by waiting until February 2005 to openly advise petitioners of the plan for acquisition, NYPA may well have created the “emergency” which deprived petitioners of the standard protections afforded in acquisition cases. A determination under EDPL 206 (D) is not necessary though, in view of the court’s finding that the acquisition was a pretext for conferring a private benefit upon Calpine.
Similarly, NYPA’s conclusory reliance upon the certificate issued by the Public Service Commission has not been addressed as it was issued prior to the award of the RFP to Calpine and thus played no role in the court’s determination.
Whether or not the “emergency” claimed by NYPA was bona fide, petitioners insist that there was no public need to acquire their property as the need for construction of the subject power plant had already been met by the Bethpage lease.
Pursuant to the Bethpage lease, Calpine had exclusive control over the property and the absolute right to operate the proposed power plant for at least 35 years, 15 years longer than the Calpine/LIPA lease. Bethpage 3 had been substantially built, had undergone testing and was scheduled to commence commercial operations, as it did, on July 1, 2005.
*717 NYPA’s alleged need for fee ownership rings hollow in view of the RFP that expressly allowed for site control by either fee ownership or a land lease. If fee ownership was a prerequisite for construction of all power plant sites, the documentation seeking bids for construction of these plants should mandate such ownership. Indeed, under the State’s own regulations, “effective control” of a premises could be obtained through a lease as well as fee ownership (see 19 NYCRR 1204.3 [f] [3] [iv]). Yet, neither NYPA nor LIPA ever considered taking anything less than fee simple acquisition in the property (Potak transcript at 59; Peterson transcript at 142).
For the record, petitioners’ expert in the energy industry, John Reed, avers that the effective custody requirements for permitting are no different from those for a certificate of occupancy (Reed affidavit U 6) and that power plants are routinely built on leased premises (Reed affidavit ¶¶ 13-14).
LIPA admits that it entered into PPAs for three power plants on Long Island where the property involved was leased, albeit by the local municipality (Peterson affidavit, June 30, 2008, 1ÍU 2-4), the very “local interest” that NYPA insists it must avoid. LIPA further admits that with respect to two out of those three power plants, NYPA had no role whatsoever (Peterson affidavit, July 23, 2008, U 4). These facts do not support NYPA.
Finally, the alleged need for ownership was a temporary one, as Calpine is entitled to purchase the entire site at the end of the 20 years for $1.
Overall NYPA’s explanation of the acquisition of petitioners’ property is not convincing. Neither NYPA nor LIPA could point to a single specific instance where an underlying lease obligation had caused a problem or jeopardized operations either with petitioners or any other power plant operation. NYPA fails to articulate in precisely what manner the acquisition of petitioners’ property fosters any benefit to the public, which had not already been obtained by the Bethpage lease. Acquisition on this basis is without foundation in the record and must be rejected (Matter of 49 WB, LLC v Village of Haverstraw, 44 AD3d at 240).
The court concludes that the acquisition was not for a public purpose but principally conferred a private benefit by eliminating Calpine’s obligation to pay rent under the Bethpage lease. When all is said and done, Calpine was the primary beneficiary of the acquisition. Based on the foregoing, the acquisition was unauthorized and is set aside (id. at 243).
*718 Petitioners’ request for judgment declaring the acquisition of the property unauthorized or excessive is denied as academic.
Petitioners’ request for judgment declaring the EDPL unconstitutional on its face is summarily denied, as the procedures therein have been held generally to satisfy the due process requirements of the Federal and State Constitutions (Matter of Aspen Cr. Estates, Ltd. v Town of Brookhaven, 47 AD3d at 273). Petitioners’ alternative request for a judgment that NYPA’s application of EDPL 206 (exemptions) unconstitutionally deprived petitioners of their property is also denied.
Petitioners’ request for an award of costs and attorneys’ fees is denied in the absence of authority for such an award (Matter of 49 WB, LLC v Village of Haverstraw, 44 AD3d at 246).
The petition is hereby granted in part and denied in part.